

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-17-00316-CV
_____

ALEXA MARIE JARPE AND JEREMY DAVID LEECH, APPELLANTS

V.

THE CITY OF LUBBOCK, APPELLEE

On Appeal from the 237th District Court
Lubbock County, Texas
Trial Court No. 2016-521,302; Honorable Les Hatch Presiding

June 19, 2019

## MEMORANDUM OPINION

Before QUINN, C.J., and PIRTLE and PARKER, JJ.

This case involves the "emergency exception"[1] to the general waiver of sovereign

immunity for negligence actions involving the use of a motor-driven vehicle[2] found in the

---

[1] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(1)(A) (West 2019). References herein to "§" or "section" are references to the Texas Civil Practice & Remedies Code.

[2] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.055(2) (West 2019).

Texas Tort Claims Act. The trial court granted a plea to the jurisdiction in favor of Appellee, the City of Lubbock, in a negligence suit filed by Appellants, Alexa Marie Jarpe and Jeremy David Leech, for personal injuries they sustained when the vehicle in which they were riding was struck by a City of Lubbock police patrol vehicle. By a single issue, Alexa and Jeremy contend the trial court erred in granting the plea to the jurisdiction. We reverse and remand for further proceedings.

**BACKGROUND**

Shortly before 10:00 p.m., on the evening of September 21, 2015, Alexa and Jeremy were involved in a motor vehicle accident when their vehicle collided with a City of Lubbock police patrol vehicle being driven by Officer John Cooke. At the time of the accident, Alexa was driving and Jeremy was a passenger. Alexa was attempting to turn left out of a grocery store parking lot, intending on heading west-bound on 4th Street, in Lubbock, Texas. At the same time, Officer Cooke was heading east-bound on 4th Street in response to an armed robbery that had occurred at a gas station located one-half mile east of the accident scene.

At the time of the original robbery dispatch, Officer Cooke was responding to a shoplifting call at a Walmart store approximately one and one-half miles away from the scene of the robbery. A stationary dash cam video recording, reviewed by the trial court, shows Officer Cooke exiting his patrol vehicle and entering Walmart. A short time later, while still inside the business, Officer Cooke reported to dispatch that he would respond to the robbery in addition to the two other police officers already dispatched. At ten minutes and twenty-seven seconds, the dash cam recording shows Officer Cooke casually walking back to his patrol vehicle. The dash cam recording ends with Officer

2

Cooke exiting the Walmart parking lot.[3] At that time, Officer Cooke made the conscious decision to respond to the robbery without the use of his patrol vehicle's emergency lights or siren in an attempt to avoid alerting the robbery suspect of his approach. In police lingo, this is known as an "invisible deployment." Because the dash cam recording of Officer Cooke's activities was deactivated once he left the Walmart parking lot, it does not depict his "invisible deployment" or the collision with the vehicle being driven by Alexa.

Deposition testimony established that it is the policy of the City of Lubbock Police Department to always use the patrol vehicle's emergency lights and siren whenever exceeding the posted speed limit by an amount in excess of ten miles per hour. Here, although the posted speed limit in the area of the accident was forty-five miles per hour, Officer Cooke candidly conceded that he was traveling in excess of the speed limit by twenty-three miles per hour immediately prior to the collision. As such, he concedes that he was traveling more than thirteen miles per hour in excess of the City's policy for an invisible deployment.[4]

In addition to disregarding the City's policy regarding excess speed and the use of emergency lights and sirens, Officer Cooke honestly admitted that, immediately prior to the accident, his eyes were also temporarily distracted from the road as he attempted to view his on-board mobile data computer (professionally referred to by police officers as their "MDC"). Whether this too was a violation of internal police policies was not clearly established because there was a discrepancy in the record regarding whether police

---

[3] Contrary to what was depicted on the dash cam video, Officer Cooke testified during his deposition that he *ran* to his patrol vehicle when leaving Walmart. The dash cam recording shows otherwise.

[4] Officer Cooke testified that he was traveling approximately sixty-eight miles per hour in the forty-five-mile-per-hour zone.

department policies at the time prohibited an officer from viewing the MDC while a police patrol vehicle was in motion.

The City of Lubbock filed a *Plea to the Jurisdiction* asserting governmental immunity pursuant to the "emergency exception" provision of the Texas Tort Claims Act. This provision provides, in relevant part, as follows:

> This chapter (the Texas Tort Claims Act) does not apply to a claim arising:
>
> * * *
>
> (2) from the action of an employee while responding to an emergency call or reacting to an emergency situation if the action is in compliance with the laws and ordinances applicable to emergency action, or in absence of such a law or ordinance, if the action is not taken with conscious indifference or reckless disregard for the safety of others . . . .

*See* § 101.055(2).

The City also alleged that Officer Cooke was protected by official immunity. Alexa and Jeremy filed a timely response asserting the City of Lubbock waived its governmental immunity by virtue of the use of a motor-driven vehicle. § 101.021(1)(A). The City responded that Officer Cooke was acting in the course and scope of his employment at the time of the accident and that he was reasonably responding to an emergency.

Alexa and Jeremy contend that because Officer Cooke was not, in good faith, reasonably responding to an emergency, the exception did not apply because Officer Cooke's actions were not in compliance with the laws and ordinances applicable to an emergency action and his actions were taken with conscious indifference or reckless disregard for the safety of others. A hearing was held on July 6, 2017, after which the

4

trial court entered an order granting the City's plea to the jurisdiction. This appeal followed.

## STANDARD OF REVIEW

A party suing a governmental entity bears the initial burden of pleading facts affirmatively demonstrating that the trial court has subject matter jurisdiction to hear the dispute. *Tex. Dep't. of Criminal Justice v. Miller*, 51 S.W.3d 583, 587 (Tex. 2001); *Tex. Ass'n of Bus. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993). A governmental entity relying upon the doctrine of immunity has the obligation to assert a lack of subject matter jurisdiction and it has the burden of raising that issue by the filing of a plea to the jurisdiction. A plea to the jurisdiction is a dilatory plea, the purpose of which is to defeat a cause of action without regard to whether the claims asserted have merit, based on the fact that immunity from suit defeats a trial court's subject matter jurisdiction. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012); *Bland Independent School Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000); *Tex. D.O.T. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999).

Whether a trial court has subject matter jurisdiction is a question of law that we review *de novo*. *Tex. D.O.T. & Edinburg v. A.P.I. Pipe & Supply, LLC*, 397 S.W.3d 162, 166 (Tex. 2013); *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004); *Tex. Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002)*.* In deciding a plea to the jurisdiction, a court should construe the pleadings liberally in favor of the pleader, look to the pleader's intent, and accept as true factual allegations contained in the pleadings. *See Miranda,* 133 S.W.3d at 226, 228. A court deciding a plea to the jurisdiction is not required to look solely to the pleadings but may consider

evidence submitted by the parties, and it must do so, when necessary to resolve the jurisdictional issues raised. *Bland*, 34 S.W.3d at 555. When, as here, the plea to the jurisdiction, including the controverting claims of waiver and "emergency," challenges the existence of jurisdictional facts, we consider all relevant evidence submitted by the parties, just as the trial court was required to do. *Miranda*, 133 S.W.3d at 227. The appropriate process of review generally "mirrors that of a summary judgment under Texas Rule of Civil Procedure 166a(c)." *Id.* at 228. In that regard, a plea to the jurisdiction may be based on the uncontroverted testimonial evidence of an interested witness if the evidence is clear, positive, and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted.

Because the procedure for review of a plea to the jurisdiction is similar to that of a traditional motion for summary judgment, if the evidence considered by the trial court is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law. *Id.* If, however, the relevant evidence creates a fact question regarding the existence of a jurisdictional fact, the trial court cannot grant the plea and the fact issue must be resolved by the fact finder. *Id.* at 227-28.

The same standard applies when, as here, the party opposing a plea to the jurisdiction has asserted undisputed facts establishing an exception to immunity (here the "use of a motorized vehicle" exception found at section 101.021(1) of the Texas Civil Practice and Remedies Code) and the governmental entity has raised the statutory "emergency" exception as an exception to the "use of a motorized vehicle" exception. If the evidence considered by the trial court is undisputed or still fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of

law; whereas, if the relevant evidence creates a fact question regarding the applicability of the waiver of immunity or the "emergency" exception, then the trial court cannot grant the plea and that fact issue must be resolved by the fact finder. *Id.* In determining whether a fact issue has been raised with regard to a jurisdictional fact, a court must review all phases of this burden-shifting framework in order to determine if the entity asserting immunity has, in fact, waived its claim of immunity. *See Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 783-84 (Tex. 2018).

### SOVEREIGN/GOVERNMENTAL IMMUNITY

Sovereign immunity protects the State, as well as its agencies and officials, from lawsuits for damages and from liability. *Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist. v. Texas Political Subdivs. Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 320, 323-24 (Tex. 2006); *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006). Similarly, the common law doctrine of governmental immunity protects political subdivisions of the State, including counties, cities, and school districts. *Ben Bolt*, 212 S.W.3d at 324. Accordingly, under the doctrine of governmental immunity, a municipality is generally immune from tort liability unless the Texas Tort Claims Act waives immunity. *City of Amarillo v. Martin*, 971 S.W.2d 426, 427 (Tex. 1998).

Immunity may be waived, and the Legislature has the exclusive authority to do so by statute. To ensure that this legislative control is not lightly disturbed, statutes waiving immunity are strictly construed in favor of not waiving immunity unless that waiver is achieved by "clear and unambiguous" language. *See* TEX. GOV'T CODE ANN. § 311.034 (West 2013). *See also Oncor Elec. Delivery Co. LLC v. Dallas Area Rapid Transit*, 369 S.W.3d 845, 849 (Tex. 2012); *Tooke v. City of Mexia*, 197 S.W.3d 325, 332-33 (Tex.

2006).  In the analysis of a claim of waiver, any ambiguity in the statute should be resolved in favor of retaining immunity.  *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 697 (Tex. 2003).

In determining whether immunity has been waived, the Texas Supreme Court has consistently deferred to the Legislature, because doing so allows the Legislature to protect the complex policymaking function surrounding suits against governmental entities.  *IT-Davy*, 74 S.W.3d at 853-54.  In that regard, the Texas Legislature adopted section 101.021 of the Texas Civil Practice and Remedies Code to deal with the waiver of governmental immunity in the context of a motor-driven vehicle accident claim.  The statute provides, in relevant part, as follows:

> A governmental unit in this state is liable for:
>
> (1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:
>
> > (A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and
> >
> > (B) the employee would be personally liable to the claimant according to Texas law . . . .

*See* § 101.021.

While the City of Lubbock concedes that the injuries claimed by Alexa and Jeremy did arise from the operation or use of a motor-driven vehicle, it does not concede that Officer Cooke would have been personally liable according to Texas law.  Instead, it contends that it has no liability because Officer Cooke would not have been personally

8

liable since he enjoys "official immunity." Specifically, the City of Lubbock contends Officer Cooke is entitled to official immunity because he was performing a discretionary act. Governmental employees are entitled to official immunity from suit arising from the performance of a (1) discretionary duty, (2) done in good faith, so long as they are (3) acting within the scope of their authority. *See City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994).

Relevant to the question of whether Officer Cooke was acting in good faith within the scope of his authority, section 546.001 of the Texas Transportation Code permits an authorized emergency vehicle to exceed a maximum speed limit, except as provided by an ordinance adopted pursuant to section 545.365, as long as the operator does not *endanger* life or property. TEX. TRANSP. CODE ANN. § 546.001(3) (West 2011). Section 546.005 of the Texas Transportation Code, entitled "Duty of Care," provides that an operator of an authorized emergency vehicle is not relieved from (1) the duty to operate the vehicle with *appropriate regard for the safety of all persons*; or (2) the consequences of *reckless disregard for the safety of others*. By the language in section 546.005, the Legislature intended for emergency vehicle operators in emergency situations to be cognizant of public safety, but only intended to impose liability for reckless conduct. *See Martin*, 971 S.W.2d at 431. "Reckless [conduct] requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man." *Morrone v. Prestonwood Christian Acad.*, 215 S.W.3d 575, 583 (Tex. App.—Eastland 2007, pet. denied). While a "momentary judgment lapse" does not raise a fact issue regarding whether an operator of an emergency vehicle committed an act that he knew or should

have known posed a high degree of risk of serious injury, a reasoned response or decision can raise that issue. *City of Houston v. Davis*, No. 01-13-00600-CV, 2014 Tex. App. LEXIS 4467, at *16-17 (Tex. App.—Houston [1st Dist.] April 24, 2014, pet. denied) (mem. op.).

### OFFICIAL IMMUNITY

Official immunity is an affirmative defense. *Wadewitz v. Montgomery*, 951 S.W.2d 464, 465-66 (Tex. 1997) (citing *Chambers*, 883 S.W.2d at 653); *City of Dallas v. Loncar*, No. 05-12-00705-CV, 2014 Tex. App. LEXIS 574, at *8 (Tex. App.—Dallas Jan. 16, 2014, pet. denied) (mem. op.). A governmental employee has official immunity for the performance of discretionary duties that lie within the scope of the employee's authority, provided the employee acts in good faith. *Wadewitz*, 951 S.W.2d at 466. In determining whether a governmental employee's actions were performed in good faith, a court must measure that conduct against an objective standard of legal reasonableness, without regard to the employee's subjective state of mind. *Id.* Where, as here, the court is looking at the conduct of a city police officer responding to an ongoing criminal event, an officer acts in good faith if a reasonably prudent officer under the same or similar circumstances could have believed the need to respond as Officer Cooke did outweighed a clear risk of harm to the public associated with the officer's chosen course of action.[5] *Id.* at 467 (applying a good faith balancing test in the context of an emergency response case).

---

[5] This good faith analysis, sometimes referred to as the "*Chambers* balancing test," is not equivalent to a general negligence test, which addresses what a reasonable person *would have done.* Rather, it is a test of what a reasonably prudent officer *could have believed. Chambers*, 883 S.W.2d at 661 n.5.

Under *Chambers*, good faith depends on how a reasonably prudent officer could have assessed both the need to which the officer responds and the risk of the officer's chosen course of action. *Chambers*, 883 S.W.2d at 656. The "need" aspect of the *Chambers* balancing test refers to the urgency of the circumstances requiring police intervention. "In the context of an emergency response, need is determined by factors such as the seriousness of the crime or accident to which the officer responds, whether the officer's immediate presence is necessary to prevent injury or loss of life or to apprehend a suspect, and what alternative courses of action, if any, are available to achieve a comparable result." *Wadewitz*, 951 S.W.2d at 467. The "risk" aspect of the *Chambers* balancing test deals with the potential consequences of the officer's chosen course of response. "The risk aspect of good faith, on the other hand, refers to the countervailing public safety concerns: the nature and severity of harm that the officer's actions could cause (including injury to bystanders as well as the possibility that an accident would prevent the officer from reaching the scene of the emergency), the likelihood that any harm could occur, and whether any risk of harm would be clear to a reasonably prudent officer." *Id.*

### ANALYSIS

Here, Alexa and Jeremy do not dispute that Officer Cooke was performing a discretionary duty while acting in the course and scope of his employment. Nor do they dispute that responding to an armed robbery generally presents an emergency situation. What they do dispute is whether the City conclusively established, as a matter of law, that Officer Cooke was entitled to official immunity and, if not, whether a fact question existed as to whether he acted in good faith in the context of the emergency at hand.

In assessing Officer Cooke's good faith, we must measure his conduct against a standard of objective reasonableness, without regard to his subjective state of mind. Because good faith depends on how a reasonably prudent officer would have assessed the "need" or urgency of the circumstances requiring police intervention when balanced against the "risk" or potential consequences of the officer's chosen course of response, we must review the facts and circumstances of each case according to the *Chambers* balancing test factors.

As to the *urgency of the matter*, it is undisputed that Officer Cooke was not the assigned officer to the armed robbery, nor was he even assigned as the primary backup officer. He testified that he was in the vicinity of the robbery (approximately one and one-half miles away) and that he *chose* to respond in addition to the two units already assigned. The vehicle's dash cam recording shows Officer Cooke casually walking back to his patrol vehicle upon exiting Walmart, with no sense of urgency. He also testified that the "biggest factor" in his decision not to activate his vehicle's emergency lights and siren was officer "safety."[6] Furthermore, as to the need for an immediate response, radio transmissions indicated that the robbery suspect was no longer at the scene of the robbery when Officer Cooke chose to speed twenty-three miles over the posted speed limit—more than thirteen miles per hour over the maximum speed allowed when responding to an emergency without the use of a siren or emergency lights—an undisputed violation of police department policy. In addition, the record reflects that

---

[6] At the hearing on the plea to the jurisdiction, the City argued that Officer Cooke did not run to his patrol vehicle out of concern for the safety of Walmart shoppers. Counsel for Alexa and Jeremy argued that he should have been more concerned about the safety of the driving public before driving twenty-three miles over the posted speed limit in a residential area while trying to read his MDC.

Officer Cooke was momentarily distracted from the road when he diverted his attention to his MDC. In that regard, it is well understood by the driving public and a matter of common sense that a distracted driver, even momentarily, is a dangerous driver. His decision to engage in such conduct was not a "momentary judgment lapse," it was a conscious decision.

In this case, Officer Cooke made a conscious choice to respond to a de-escalating "emergency," while looking down at his MDC, traveling at a speed more than two times the police department's policy limit, in the dark, without his emergency lights or siren, and without assuring himself that the roadway ahead of him was clear. Choosing to respond without emergency indicators required a heightened need for vigilance presented by the danger of operating a speeding vehicle, on one of the City's main thoroughfares, in the dark. Furthermore, given the short distance to the scene of the crime and the report that the suspect had already left the scene, a reasonable officer would have had his eyes on the road, looking for any suspicious activity by a fleeing subject, not looking down at his MDC. The nature of the risks and the potential severity of the harm to the public was something that should have been readily apparent to a reasonably prudent officer.

As a veteran police officer, Officer Cooke was aware of the potential risk to the public presented by looking away from the road, while speeding, at night, without his emergency lights and siren. Despite the self-serving affidavits of other officers, the record shows that the need to which Officer Cooke was responding was not a potentially life-threatening robbery since the perpetrator had already left the premises. Officer Cooke was not the closest available responder, he was not assigned to the robbery call, and his presence was not immediately necessary to prevent injury or loss of life. Speeding to the

scene of the robbery was not his only available option, nor was it absolutely necessary that he approach the scene of the robbery without illuminated emergency lights or a siren. Additionally, in the few seconds it would have taken him to travel from the scene of the accident to the scene of the robbery, it was highly unlikely that he was going to gain any additional information concerning the robbery by unnecessarily and dangerously diverting his eyes from the roadway in order to read the MDC. Accordingly, the evidence demonstrates that the City did not establish, as a matter of law, that Officer Cooke acted in good faith with respect to whether a reasonable officer would have found it prudent to respond to this perceived need in the manner he chose.

### CONCLUSION

Because the City of Lubbock did not provide conclusive evidence of Officer Cooke's good faith under the *Chambers* balancing standard, we conclude the trial court erred in granting the City's plea to the jurisdiction. Accordingly, we reverse the judgment of the trial court, render judgment denying the City's plea to the jurisdiction, and remand this matter to the trial court for further proceedings consistent with this opinion.

Patrick A. Pirtle
Justice

14